FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 1 0 2025

KEVIN R. WEIMER, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**Cedrick Landry**, as
Administratrix of the Estate

Of **Travis Landry**, Deceased, Plaintiff

JURY TRIAL

CIVIL ACTION FILE NO.

**1:25-CV-1962**

Defendants.

Fulton County Jail, Fulton County

Sheriff Patrick Labat

---

## COMPLAINT FOR DAMAGES

Cederick Landry, as Administratrix of the Estate

of Travis Landry ("Plaintiff"), files this complaint for damages

against the defendants, showing the Court as follows:

### Introduction

1.

This civil action is brought under 42 U.S.C. § 1983 for September

22, 2022 wrongful death of Travis Landry in the Fulton County Jail.

Plaintiff alleges that Detention Officer Unknown Officer others were

deliberately indifferent to a known risk of serious harm to Landry, a

detainee, when the Unknown Officer left Travis unsupervised in a high-risk area

of the jail for approximately when Travis was killed by an unattended inmate.

### JURISDICTION

2.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well

as the Fourteenth Amendment of the United States Constitution. This Court

has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3) and (4).

3.

All parties are subject to the jurisdiction of this Court.

1

VENUE

4.

All acts or omissions alleged in this complaint occurred in the Northern District of Georgia, where at least one defendant resides, and therefore venue is properly within this district under 28 U.S.C. § 1391(b)(2).

PARTIES

5.

Plaintiff Cederick Landry ("Plaintiff") is the Administrator of the Estate of Travis Landry ,deceased. He is a resident of Louisiana . As personal representative of Landry 's estate, she is the proper person to bring an action to recover compensation for Landry's death, pain and suffering, for punitive damages, and for funeral/burial, medical and other necessary expenses.

6.

Travis Landry was a citizen and resident of Louisiana.

(20 ) years old at the time of his death but he jailed, incomplete autopsy .

Defendant Fulton County, Georgia

7.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus constitutes a state actor. Through its Board of Commissioners, Defendant Fulton County provides funding for the operation of the Fulton County Jail.

8.

Defendant Fulton County may be served with process through the Chairperson of its Board of Commissioners, Rob Pitts, at 141 Pryor Street SW, 10th Floor, Atlanta, GA 30303. Defendant Fulton County is subject to the jurisdiction of the Court and venue is proper.

Defendant Sheriff Patrick Labat

Defendant Sheriff Patrick Labat is a citizen of Georgia and resides within the Northern District of Georgia. Defendant Labat may be served with process at 185 Central Avenue SW, 9th Floor, Atlanta, Georgia 30303. Defendant Labat is subject to the jurisdiction of this Court and venue is proper.

9.

At all times relevant to this action, Defendant Patrick Labat was the duly

2

Case 1:24-cv-03400-TWT Document 1 Filed 07/31/24 Page of 63

elected Sheriff of Fulton County, Georgia ("Defendant Labat"). Defendant Labat was responsible for the day-to-day operations of the Fulton County Sheriff's Office, including the Fulton County Jail. Defendant Labat was responsible for ensuring and maintaining the physical safety and welfare of detainees at the Fulton County Jail. In his capacity as Sheriff, Defendant Labat had custody, control, and was in charge of the Jail, Jail staff, and the detainees/inmates populating the Jail.

10.

At all time relevant to this action, Defendant Labat acted under the color of state law. Defendant Labat is being sued for damages in his individual capacity.

### Unknown Officer

11.

Unknown Officer, at the time of the events described in this complaint, held the position of Detention Officer at the Fulton County Jail. Upon information and belief, Unknown Officer is a citizen and resident of the state of Georgia, residing in the Northern District of Georgia.

Unknown Officers may held the responsibility of monitoring inmates, securing detention facilities, and maintaining the physical safety and security of inmates, including that of decedent Travis Landry.

### Additional Defendants

12.

Plaintiff plans to uncover further defendants whose deliberate indifference played a role in the tragic death of Landry. This may include, among others, deputies or jailers accountable for the absence of supervision when Landry and he with left with out supervision.

At all times relevant herein, the defendants acted under color and authority of state law for purposes of the federal constitutional claims against them.

### FACTS

3

## The Fulton County Jail

14.

On September 22, 2022 Travis Landry was a detainee at the Fulton County Jail. On that date he was found dead autopsy incomplete.

15.

Detainees have long been a well-known and well-documented problem at the Fulton County Jail, resulting in violent attacks, severe injuries, and deaths.

16.

For example, on or about April 20, 2022 a sweep of the Fulton County Jail resulted in the discovery of nearly one hundred knives or shanks.

17.

Less than one year later, in March 2023, a search of only one third of the housing zones in the Jail uncovered more than two hundred homemade knives/shanks.

18.

By the time of the mid-March 2023 search, there had been seventy-eight stabbings at the jail in 2023, more than one per day.

19.

With an inmate population then ranging between 3,200 and 3,400 this means that by the end of 2023, more than ten percent of the inmate populationwould have become stabbing victims.

20.

In a dramatic and well-publicized appearance before the Atlanta City Council on October 3, 2022 Defendant Labat had a Jail guard roll a wheelbarrow full of knives/shanks confiscated from the Fulton County Jail into the Atlanta City Council Chambers.

21.

During that October 3, 2022 meeting before the Atlanta City Council Defendant Labat made reference to the deaths.

22.

At the time of the October 3, 2022 meeting, the Jail was so overcrowded that its floors, on average, were lined with five hundred (500) doggie trays to

4

house detainees for whom there was no room inside a cell.

23.

That on April 10, 2024 Travis Landry was allegedly found unresponsive in the Fulton County jail .

24.

That the on that day of the death a preliminary cause of death was labeled as suicide however no final report has been rendered and a 2nd autopsy has been done and the preliminary findings do not support the findings.

25.

That the month of 37 year old Leonard Fortner was in the same facility of over four months without bond was stabbed to death by fellow inmate .

25.

That further, on information and believe Travis Landry was in the custody of the Fulton County jail and no reports of Suicide or any indication of any mental health issues was provided to the family no reported by or to any person in the jail.

26.

That while in the jail he was on a weekly basis requested that his parents , family send him money thousands of dollars because he needed in the jail and shortly before his death he requested additional funds about 3 days before his death.

27.

That also in the month of April another Fulton Couty inmate was found dead in his jail cell during a routine security round Leonard Fortner was found stabbed to death.

28.

That further Michael Anthony Hollard was found dead in his jail cell during a routine security round in 2024.

29.

That the justice began a formal investigation after the death of LaShawn Thompson who was a malnourished man covered in lice and found in a filthy cell in the jails mental health unit.

That the jail has a history of overcrowding, lack of personal all highlighted in the DOJ report and the history and the issue of the jail oversight is well know.

5

Alton Adams, Fulton County's Chief Operating Officer for Justice, Public Safety and Technology (appointed in December 2021), said at the Fulton County Board of Commissioners meeting on July 10, 2023 that, in all, Fulton County has an average weekly jail population of about 3,600 people. The Jail was built to hold up to 1,125 individuals.

24.

In 2023, the Sheriff's General Counsel, Amelia Joyner, told a panel of Georgia State Legislators investigating the jail that overcrowding strains the physical limits of the aging jail and contributes to the violence.

25.

In the first ten months of 2023, the Fulton County Jail recorded approximately 293 stabbings, 337 fights, 922 assaults, and more than 1,186 confiscated knives/shanks. Further by October over 4

26.

Two years earlier, during the fall of 2021, Defendant Labat had given the Fulton County Commissioners a tour of the Fulton County Jail. The tour allowed the Commissioners to observe firsthand the deteriorating infrastructure and conditions at the Fulton County Jail that contributed to the violent and dangerous atmosphere there.

27.

Defendant Labat has explained to the Fulton County Commission and to the general public on multiple occasions (including in 2021, 2022, and 2023) why there is such a proliferation of homemade knives and shanks at the Fulton County Jail. Detainees at the Jail fashion metallic weapons from the crumbling physical infrastructure of the Jail.

28.

In a September 20, 2023 meeting before the Fulton County Commission, Defendant Labat brought several inmates of the Fulton County Jail to speak directly to the Fulton County Board of Commissioners.

29.

"The jail itself is deteriorating," inmate Kenneth Perry Jr. said.

6

"The walls are crumbling down, and inmates are creating shanks out of the walls."

30.

According to an Atlanta Journal Constitution investigation, more than sixty people who were held in the Fulton County Jail died between 2009 and October 2022, the highest total of any jail in Georgia during that time.

31.

According to the Fulton County Sheriff's Office, from January 2021 to December 2022, deaths at the Fulton County Jail quadrupled.

32.

The Jail's reputation as one of the most dangerous jails in the country has become so infamous that it prompted the United States Department of Justice ("DOJ") to launch an investigation on July 13, 2023, into both the Fulton County Jail and Fulton County.

33.

Summarizing the reasons for the DOJ investigation, Attorney General Merrick B. Garland stated, "We launched this investigation into the Fulton County Jail based on serious allegations of unsafe, unsanitary living conditions at the jail, excessive force and violence within the jail, discrimination against incarcerated individuals with mental health issues, and failure to provide adequate medical care to incarcerated individuals."

34.

The Department of Justice investigation was premised in part on the Civil Rights of Institutionalized Persons Act — a federal law that authorizes the Department of Justice to investigate state institutions, including county jails, to determine whether incarcerated people are subjected to a pattern or practice of constitutional violations.

35.

According to Assistant Attorney General Kristin Clarke, the DOJ's ongoing investigation of the Fulton County Jail revealed that at one point in 2022, more than two hundred weapons were discovered during a sweep of the main jail.

36.

DOJ investigators have reported credible allegations that inmates of the

jail are housed in a facility considered "structurally unsafe," and that correctional officers are using excessive force, and that violence is widespread, resulting in serious injuries and even murders.

37.

Ryan Buchanan, United States Attorney for the Northern District of Georgia, joined Attorney General Garland, providing his view of the justification for the DOJ investigation, stating, "The recent allegations of filthy housing teeming with insects, rampant violence resulting in death and injuries, and officers using excessive force are cause for grave concern and warrant a thorough investigation."

38.

Condemning the Fulton County Jail, in particular, Assistant Attorney General Kristen Clarke said, "The unconstitutional conditions that we see too often inside jails and prisons have no place in society today."

39.

"Our investigation into these matters is guided by one core principle: People held in jails and prisons do not surrender their constitutional and civil rights at the jailhouse door," Clarke said.

40.

According to Clarke, 87% of the jail population in Fulton County is Black and the vast majority have not been convicted. They are awaiting bail hearings, competency evaluations and restoration services or are detained because of their inability to post bail.

41.

Defendant Labat has publicly admitted that he lacks the resources to carry out his legally mandated responsibility to protect the constitutional rights of detainees at the Fulton County Jail.

42.

On July 21, 2023 representatives of the National Institute of Corrections (NIC) of the U.S. Department of Justice and the Bureau of Judicial Assistance conducted a site visit to the Fulton County Jail. Among other actions, these representatives met with Defendant Labat.

43.

Defendant Labat informed the NIC and BJA representatives that during his

8

term thousands of homemade knives made of materials from the deteriorating facility had been confiscated at the Jail.

44.

Defendant Labat also informed the NIC and BJA representatives that detainees often fashion weapons when they do not feel safe.

45.

The proliferation of knives/shanks and stabbings at the Fulton County Jail continues unabated. In a mid-July 2024 news conference, Defendant Labat stated that since June 1, 2024 there had been ten stabbings at the Jail and that seventy-five (75) knives/shanks had been confiscated.

THE FATAL DEATH OF Travis Landry

46.

On December 7, 2020, Landry entered the Fulton County Jail (located at 901 Rice St. NW, Atlanta, GA 30318) as a pretrial detainee. Landry remained a pretrial detainee in the Fulton County Jail up until the time of his death there on September 22, 2022.

47.

In April 2022, Landry was attacked in the Fulton County Jail by multiple inmates. This attack was ordered by a gang known as "Slime."

48.

While Landry was being attacked, Landry was fighting back and yelling while making his way to an area known as the "red zone" where more officers could see Landry, with the hope of increasing his chances of surviving the attack. Jail officials were aware of this attack on Landry.

49.

Landry was not taken, though he should have been taken, for medical treatment after the April 2022 attack.

50.

Landry remained housed in the area of the Jail known as 7North, even after the April 2022 attack, keeping him on the same floor and in close proximity to violent, dangerous inmates who were affiliated with groups that had shown increasing hostility toward Landry.

51.

Defendant Labat and Defendant Muhammad, along with other Sheriff's

9

Office employees, had actual knowledge of the April 2022 attack on Landry.

The Murder of Travis Landry

52.

On September 22, 2022, Landry was being housed on the floor designated "7North."

53.

7North houses the jail's most dangerous detainees/inmates.

54.

On September 22, 2022, Defendant Muhammad was assigned to 7North for a 7:00 p.m. to 7:00 a.m. shift.

55.

Under the Fulton County Sheriff's Office policy, among the responsibilities of a detention officer during his or her shift is to "[c]onduct a personal visual well-being check of all inmates at least every 30 minutes (every 15 minutes for special classification inmates)." FCSO Jail Operations Post Order No. 24 (8/31/2022), § IV(B)(3).

56.

Under the Fulton County Sheriff's Office policy, another responsibility of a detention officer during his or her shift is to conduct security rounds "once per hour in all housing units with the exception of Medical, Administrative, and/or Segregation Zones (security rounds are to be conducted every thirty (30) minutes/twice (2) per hour. Medical Unit Security Rounds for inmates on suicide watch will be conducted every fifteen (15) minutes.)" FCSO Jail Operations Post Order, No. 24 (8/31/2022), § IV(B)(1).

57.

On September 22, 2022, at approximately 8:35 p.m., Defendant Muhammad abandoned his post, leaving the inmates of 7North out of their cells and unattended.

58.

At approximately 9:00 p.m. that day, the unattended inmates informed Tower Officer Tamesha Dodson ("DO Dodson"), via intercom, that Landry was unresponsive on the Day Room floor in a pool of blood.

59.

The inmate who fatally stabbed Landry was Garfield Sewell, a pre-trial

10

detainee being held to stand trial for a murder that occurred almost two years before this incident.

60.

DO Dodson radioed Defendant Muhammad, instructing him to return to his post.

61.

Defendant Muhammad responded with, "Stand by."

62.

At approximately 9:16 p.m., DO Hugger left his post at 7South in order to assist 7-North in monitoring the unattended inmates.

63.

Upon his arrival at 7-North, DO Hugger observed that Landry was lying on the floor face down, motionless, in a pool of blood.

64.

DO Hugger asked DO Dodson to call for a stretcher.

65.

At approximately 9:31 p.m., a medical provider, PA Morals, arrived and examined Landry, checking for a pulse.

66.

PA Morals asked DO Hugger to call EMS and stated that there was no need to conduct CPR because Landry had been dead for some time.

67.

DO Hugger radioed the tower officer on 7North to call EMS, but was told to stand down by Captain Johnson.

68.

Defendant Muhammad arrived back to 7-North at 9:35 p.m, one hour after leaving his post unattended.

69.

Had Defendant Muhammad remained at his assigned post, conducted his security rounds as required by the Sheriff's Office policy, or conducted visual well-being checks of all the inmates under his watch as required by the Sheriff's Office policy, Defendant Muhammad either (a) would have prevented Landry's attack because of his presence on 7North or (b) at least would have been present when Landry was found unresponsive making it

11

possible to get medical help more quickly and perhaps save Landry's life.

70.

Grady EMS arrived on the floor at 10:05 p.m.

71.

Dr. Lindsey, of Grady Memorial Hospital, pronounced Landry dead at 10:12 p.m.

## COUNT I

### DEFENDANT FULTON COUNTY

### 42 U.S.C. § 1983; Fourteenth Amendment

### Monell Liability

72.

Travis Landry, as a pretrial detainee, was entitled to the protection of his constitutional rights under the Fourteenth Amendment, including protection from deliberate indifference by Defendant Fulton County to his safety and well-being.

73.

This private cause of action against Defendant Fulton County is based on the U.S. Supreme Court's holding in Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978), where the Court held that a state actor can be liable under 42 U.S.C. § 1983 "when execution of a government's policy or custom is responsible for the alleged deprivation of civil rights."

74.

"In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice," McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004).

75.

A policy is a statement or other decision "officially adopted and promulgated by a government or its officers, while a custom receives no such formal approval through ... official decision-making channels," Monell, 436 U.S. at 690-691. A custom, rather, is "a practice that is so settled and permanent that it takes on the force of law," McDowell v. Brown, 392 F.3d at 1290.

12

76.

For purposes of Monell liability and the allegations asserted herein, Fulton County, Georgia is a state actor.

77.

To allege a viable Monell claim the Plaintiff must show (a) violation of a constitutional right; (b) that the governmental entity had a custom or policy that constituted deliberate indifference to that constitutional right; and (c) that the policy or custom caused the violation.

78.

Though the Sheriff operates the Fulton County Jail, Defendant Fulton County, through its Board of Commissioners, provides funding for the Jail's operations.

79.

As asserted herein, Defendant Labat made repeated funding requests to the Commissioners of Defendant Fulton County to address the Jail's crumbling infrastructure that detainees were using to fashion knives and shanks that were ultimately used to injure or kill other inmates.

80.

In 2021, nearly a year before Travis Landry was killed, Defendant Labat took Fulton County's Commissioners on a tour of the deteriorating Jail so they could see for themselves how detainees could use the Jail's crumbling infrastructure to fashion weapons.

81.

Defendant Fulton County's Commissioners were able to see firsthand that the Jail's crumbling infrastructure provided an almost inexhaustible supply of materials from which knives/shanks could be fashioned.

82.

Not only were Defendant Fulton County's Commissioners able to view the Jail for themselves, but throughout 2021, 2022, and 2023 they were repeatedly presented with statistics (through both the Defendant Sheriff and the local media) concerning violence at the Jail, the number of knives/shanks confiscated in the Jail, overcrowding at the Jail, understaffing at the Jail, the deplorable physical condition of the Jail, and the number of inmates injured or killed in knife attacks at the Jail.

13

83.

By not providing the requested funding to address the crumbling infrastructure from which weapons were made, Defendant Fulton County virtually assured that the violence at the Jail would continue, that knives and shanks would continue to be fashioned in alarming numbers from the Jail's infrastructure, and that detainees at the Jail would continue to be victimized by knife violence.

84.

In January 2021, Defendant Labat told the Fulton County Commission that without additional funding or space he would be unable to fulfill his constitutional obligations to detainees at the Jail.

85.

Defendant Fulton County, through its Commissioners, had known for years prior to Travis Landry's death that the Jail was seriously overcrowded, seriously understaffed, and dangerous, exposing detainees like Travis Landry to life and death conditions they were powerless to remedy.

86.

In testimony given in November 2023 to a Georgia Senate panel investigating the Fulton County Jail, the Sheriff's Chief Legal Counsel, Amelia Joyner, explained that the annual budget allocated by Defendant Fulton County to the Sheriff, leaves the jail generally underfunded. "We operate at a deficit," she explained.

87.

As an example of the underfunding, one of the State Senators observed that the Jail's current expenses for medical care far exceeded the $36 million allocated for that category.

88.

Defendant Fulton County's budget decisions show that it had a persistent and widespread practice of underfunding the Fulton County Jail so as to deny Decedent Travis Landry's constitutional rights.

89.

Defendant Fulton County violated Travis Landry's constitutional rights by not protecting his health and safety.

90.

14

Defendant Fulton County knew of, through its Board of Commissioners, and disregarded an excessive risk of serious harm to Travis Landry .

91.

Defendant Fulton County, through its Board of Commissioners, was well aware of facts that suggested a substantial risk of serious harm in the Fulton County Jail existed for Travis Landry and other detainees.

92.

By virtue of the sheer number of knives/shanks in the Fulton County Jail, made from the facility's crumbling infrastructure and the sheer number of knife attacks in the Jail, combined with the violent atmosphere, overcrowding, understaffing, and deplorable living conditions, Defendant Fulton County was aware that Travis Landry and other detainees faced a substantial risk of

serious harm.

93.

In the context of budgeting decisions, a plaintiff must show that the constitutional violation complained of is a "highly predictable consequence" of the budgeting practice, McDowell v. Brown, 392 F.3d at 1292.

94.

Plaintiff has alleged facts herein sufficient to identify a pattern of injuries linked to the budgetary practices of Defendant Fulton County.

95.

A reasonable member of the Fulton County Commission would conclude, based on firsthand information known to the Commissioners, that the budget decisions would lead to the highly predictable consequence of the constitutional violation at issue, i.e., failure to protect detainees" health and safety from the fashioning of knives/shanks from the Jail's crumbling infrastructure material and the usage of those knives/shanks by detainees against other detainees.

96.

The Fourteenth Amendment imposes a duty on Jails to ensure detainees' safety and well-being. Doing so, in part, in this case, required the Sheriff's dependence on funding provided by Defendant Fulton County and its Board of Commissioners.

97.

By not providing funding it knew to be critical to the safety and well-being of Fulton County Jail detainees Defendant Fulton County, through its Board of Commissioners, acted with deliberate indifference to the constitutional rights of detainees like Travis Landry to have their physical health

and well- being protected.

98.

The funding decisions Defendant Fulton County made directly allowed the conditions to continue to exist (crumbling infrastructure, overcrowding, understaffing, deplorably unsanitary conditions) that have resulted in death and injury through knife attacks on numerous detainees at the Jail.

99.

As stated above, numerous Fulton County Jail detainees have been the victims of knife violence. For example, on June 21, 2022, barely three months before Travis Landry was killed, Anthony Jenkins, a detainee at the

Fulton County Jail, was reportedly stabbed over twenty (20) times.

100.

The crumbling infrastructure of the Jail coexists with chronic unsanitary conditions, chronic overcrowding, and chronic understaffing, coalescing to make the Fulton County Jail one of the most dangerous jails in the nation for detainees.

101.

From the above allegations the Court can reasonably infer a pattern of similar constitutional violations demonstrating Defendant Fulton County's policy or custom of failing to provide for the safety and well-being of detainees by virtue of the underfunding the Fulton County Jail, constituting deliberate indifference to the constitutional rights of detainees, like

Travis Landry .

102.

Defendant Fulton County's widespread and sustained practice of failing to adequately fund jail operations, including repairs to the facility's crumbling infrastructure, was the moving force that directly contributed to

16

Case 1:25-cv-01962-SDG    Document 1    Filed 04/10/25    Page 17 of 31

Travis Landry's death.

103.

Like a domino effect, Defendant Fulton County's deliberate indifference failure to adequately fund Jail operations directly led to the Jail's widespread inability to:

a. provide for the safety and well-being of detainees, like Travis Landry

b. provide for the repair of the crumbling Jail infrastructure from which knives and shanks are fashioned;

c. provide for a sanitary environment for detainees, the lack of which, according to the Department of Justice, contributes to Jail violence;

d. provide for adequate space to prevent overcrowding, the lack of which, contributes to Jail violence; and

e. provide for adequate staffing of the Jail, the lack of which contributes to Jail violence.

104.

As a direct and proximate result of Defendant Fulton County violating Travis Landry's Fourteenth Amendment rights, Travis Landry suffered

physical injuries, pain and suffering, mental and emotional distress,

and ultimately, death.

105.

As a result of Defendant Fulton County's actions and inactions, Plaintiff is entitled to compensatory damages for the loss of Travis Landry's life

and damages in an amount to be proven at trial for Landry's pain and suffering.

COUNT II:

DEFENDANT SHERIFF PATRICK LABAT

42 U.S.C. § 1983: Fourteenth Amendment

Deliberate Indifference to Risk of Serious Harm

106.

Travis Landry, as a pretrial detainee, was entitled to the protection of his

constitutional rights under the Fourteenth Amendment, including protection

from deliberate indifference to his safety and well-being.

107.

According to the website of the Sheriff of Fulton County, one of the Sheriff's responsibilities is as a Detention Officer. The Sheriff's role in this regard is described as follows: "The sheriff is the official jailer of the county and is responsible for the health, safety, and welfare of all inmates."

108.

Since becoming Sheriff in January 2021, Defendant Labat has made numerous efforts to persuade Defendant Fulton County to increase its funding to the Sheriff's Office to alleviate serious overcrowding, to alleviate serious understaffing, to clean up the deplorably unsanitary physical condition of the Jail, and to address the crumbling infrastructure of the Jail that was frequently used by detainees to fashion knives and shanks.

109.

This lack of funding, Defendant Labat asserted, to the Fulton County Commission in January 2021, prevented him from performing his constitutional duty to protect the safety and well-being of inmates under his charge.

110.

While Defendant Labat was making repeated funding requests of Defendant Fulton County, he managed an Inmate Welfare Fund over which there was virtually no Fulton County oversight.

111.

Defendant Labat took office as the elected Sheriff of Fulton County, Georgia on January 1, 2021.

112.

Defendant Labat has, over a period of several years, repeatedly and vociferously decried the lack of Fulton County-allocated funds for urgent jail priorities such as inmate security, upkeep of deteriorating jail facilities, and staffing.

113.

Notwithstanding, Defendant Labat has misused millions of dollars designated by Fulton County as an Inmate Welfare Fund.

114.

18

By Defendant Labat's own public admission these funds, intended for inmate welfare, have repeatedly been misused, becoming the Sheriff's Office's private slush fund.

115.

Several provisions of the Fulton County Code of Ordinances are relevant to the Inmate Welfare Fund.

116.

Section 146-81 of the Fulton County Code of Ordinances provides as follows: "The sheriff is hereby authorized to establish a bank account in the name of county jail welfare fund, for recording all concession purchases, sales, and other welfare disbursements, and all funds for the welfare of persons committed to the jail shall be promptly deposited in said account, and not less than twice weekly." This Ordinance was enacted in 1983.

117.

While the heading of the above-cited County Ordinances is "County Jail Welfare Fund," this fund is commonly known as the Inmate Welfare Fund.

118.

Instead of spending the funds allocated for matters pertaining to inmate welfare, the Sheriff's Office spent the money on a host of matters unrelated to inmate welfare.

120.

The sums in the chart above, exceed three million dollars, but likely represent only a fraction of the funds Defendant Labat misused.

121.

For the misused funds, Defendant Labat has never reimbursed the Inmate Welfare Fund.

122.

Defendant Labat's misuse of the Inmate Welfare Fund would have continued unabated absent red flags from Fulton County finance officials and a request from a Fulton County Commissioner pertaining to Inmate Welfare Fund purchases.

123.

Belatedly aware of the indefensible nature of the Inmate Welfare Fund misappropriation, Defendant Labat blamed the expenditures on having been

19

purchased out of the wrong fund.

124.

Section 146-84 of the Fulton County Code of Ordinances provides as follows: "All purchases and other disbursement shall be made by check signed by the chief jailor and countersigned by the sheriff. All financial records relating to said welfare fund shall be approved and audited by the internal audit division of the comptroller's office and also subject to the general county audit." This Ordinance was enacted in 1983.

125.

Section 146-84 would have required Defendant Labat to countersign all checks for purchases and other disbursements made from the Inmate Welfare Fund.

126.

A countersignature on a check indicates that both signers are in agreement as to what will be done with the check in question.

127.

Defendant Labat's misappropriation of the Inmate Welfare Fund diverted funds that were sorely needed to help make the Fulton County Jail a safer and more humane place for pretrial detainees like Travis Landry.

128.

Section 146-82 of the Fulton County Code of Ordinances provides as follows: "A committee composed of the sheriff, the chief jailer, and the chairman of the board of commissioners or his appointee is hereby established, who shall be responsible for all items purchased out of the welfare fund." This Ordinance was enacted in 1983.

129.

When asked on or about October 31, 2023 about the committee required by Section 146-82, the Chair of the Fulton County Commission, Rob Pitts, stated to a reporter from WSB-TV that he had never heard of the committee, but that its existence sounded like a great idea.

130.

When asked on or about October 31, 2023 by a reporter from WSB-TV whether the committee ever held meetings: "Not once have they met in my entire time being sheriff."

20

131.

The Committee charged with legal responsibility for all items purchased out of the inmate welfare fund never met a single time in 2020, 2021, or 2022.

132.

Defendant Labat attempted to deflect responsibility for failing to comply with the committee's ministerial duty, by using the term "they." By county ordinance, as the elected Sheriff of Fulton County, Defendant Labat was a member of the Committee overseeing the Inmate Welfare Fund that never held a meeting during his tenure as Sheriff (1/1/21 through at least October 31, 2023).

133.

Defendant Labat was aware of the almost nonexistent oversight of the Inmate Welfare Fund, including by anyone in the Sheriff's Office, the Fulton County Commission, or the Inmate Welfare Fund's Independent Auditors.

134.

Illustrative of this virtually nonexistent oversight of the Fund is a passage from the Independent Auditor's Report of the Inmate Welfare Fund for the year ended December 31, 2022. At page six of this Report the following appears: "The Fund also accounts for the disbursement of these moneys for certain items to be used for the betterment of the prisoner population" [designation of purpose for the Inmate Welfare Fund].

135.

Notwithstanding the above-referenced designation of purpose for the Inmate Welfare Fund, the Independent Auditor's Report for the year ended December 31, 2022 failed to mention a single item from the chart above for improper 2022 expenditures from the Inmate Welfare Fund.

136.

Despite the obvious nature of the misappropriation of millions of dollars in funds designated for inmate welfare, Defendant Labat defended the expenditures in a local television interview in October 2023 by contending that "everything" spent was for "the betterment of the Sheriff's Office."

137.

The Independent Auditor's Report states that the Inmate Welfare Fund is

21

"for the betterment of the prisoner population," Defendant Labat, on the other hand, stated that it is proper to use the Inmate Welfare Fund for the betterment of the Sheriff's Office.

138.

Specifically, Defendant Labat told a reporter from WSB-TV on or about October 31, 2023 that "[e]verything that has come out of the inmate welfare fund has been spent on the betterment of the sheriff's office."

139.

Contrary to Defendant Labat's misrepresentation about the purpose of the Inmate Welfare Fund, the Ordinance creating it clearly sets forth its purpose, to provide "for the welfare of persons committed to the jail," [Section 146-81 of the Fulton County Code of Ordinances].

140.

On or about October 31, 2023 Defendant Labat acknowledged to a WSB-TV reporter that some of the purchases from the Inmate Welfare Fund had nothing to do with inmate welfare.

141.

On or about October 31, 2023 Defendant Labat acknowledged to a WSB-TV reporter that he had no knowledge of the county ordinance governing the Inmate Welfare Fund until shortly before his staff provided it to the local reporter.

142.

Defendant Labat contends that two employees were terminated, at least in part, due to irregularities in spending related to the Inmate Welfare Fund.

143.

On November 15, 2023, the Fulton County Board of Commissioners abolished the Inmate Welfare Fund due to Defendant Labat having misused millions of dollars designated for the welfare of detainees. This misuse dated back to at least 2021.

144.

Among the living conditions at the Fulton County Jail that led to the United States Department of Justice launching a formal investigation of the Jail are: filthy housing, filthy housing teeming with insects, unsanitary living conditions, structurally unsafe Jail facility, failure to provide adequate

22

medical care, inadequate mental health care, and rampant violence.

145.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to address some of these dire needs.

146.

On July 21, 2023, the National Institute of Corrections of the U.S. Justice Department and the Bureau of Justice Assistance Critical Response Team conducted a site visit to the Fulton County Jail. This site visit resulted from a September 20, 2022 (two days before Dino Landry's death) request from Defendant Labat to the National Institute of Corrections for technical assistance.

147.

Defendant Labat advised members of the site visit team that the number of uniformed staff vacancies in the Jail were at a critical staffing shortage level.

148.

According to Defendant Labat, a housing floor at the Jail should ideally have two officers in the housing control room, as well as three officers who constantly move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

149.

According to Defendant Labat, in practice, there is typically one officer in the housing control room and, at most, one officer moving through the housing zones with nearly two hundred (200) detainees.

150.

On September 23, 2022, at the time Travis Landry was killed, there was not a single officer moving through the six housing zones.

151.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to hire additional uniformed staff members or repair portions of the crumbling infrastructure from which knives/shanks were being fashioned, particularly in the more dangerous areas of the Jail, like 7-North, where Travis Landry was housed.

152.

The presence of an additional uniformed staff member at the Fulton County Jail on the cell block deserted by uniformed staff on September 22, 2022 might arguably have discouraged the knife attack on Travis Landry.

153.

The presence of an additional uniformed staff member at the Fulton County Jail on the cell block deserted by uniformed staff on September 22, 2022 might arguably have saved Travis Landry's life.

154.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to improve the living conditions of detainees at the Fulton County Jail.

155.

The living conditions of the detainees at the Fulton County Jail directly contribute to the fear of detainees, deterioration of the mental health of detainees, and further escalate the violence.

156.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to complete one of the recommendations the National Institute of Corrections and the bureau of Justice made during their July 21, 2023 site visit to the Fulton County Jail, a recommendation that should have foreseeable to Defendant Labat long before the site visit – "Complete an inspection of each cell and dayroom, looking for loose material on bunks, desks, dayroom tables, light fixtures, plumbing, and more that could be removed and used as a weapon. If any loose materials are found, remove the material or replace the fixture."

157.

The living conditions of the detainees at the Fulton County Jail directly contributed to the proliferation of violence at the Jail.

158.

Defendant Labat was aware that the Inmate Welfare Fund was created to benefit detainees at the Fulton County Jail.

159.

Defendant Labat was aware that the misdirection of Inmate Welfare Funds to other purposes not to benefit inmates was a serious deprivation for

24

detainees at the Fulton County Jail and, if used properly could have helped him meet his constitutional obligation to protect detainees at the Jail.

160.

Defendant Labat was aware that detainees in the Fulton County Jail, including Travis Landry, were incarcerated under conditions posing

a substantial risk of serious harm.

161.

Defendant Labat was aware of the fact that the detainees at the Fulton County Jail lived under conditions that could subject them to the substantial risk of serious harm, including from other detainees.

162.

Defendant Labat ignored this substantial risk by misdirecting millions of dollars intended for the welfare of persons, including Travis Landry, committed to the Fulton County Jail.

163.

Defendant Labat was deliberately indifferent to the substantial risk of serious harm that Travis Landry faced at the Fulton County Jail, including

from attacks with knives/shanks fashioned from the crumbling

infrastructure of the Jail.

164.

Defendant Labat's deliberate indifference was a direct and proximate cause of the injuries, damages, and death Travis Landry suffered.

165.

The actions of the Defendant Sheriff Labat, as described above, contravened established law that a reasonable jail official should have known.

166.

Because of Defendant Labat's deliberate indifference, Plaintiff is entitled to an award of damages for Landry's injuries, pain and suffering of mind and body, and death.

## COUNT III
### Violation of ministerial duties

25

under Georgia law

167.

Unknown Officer was required to perform a visual well-being check of all inmates in 7-North every 30 minutes, but he instead abandoned his post during the hour of Landry's death.

168.

Unknown Officer was required to conduct security rounds once per hour in all housing units in 7North, but instead abandoned his post during the time period when Dino Landry was killed on September 22, 2022.

Case 1:24-cv-03400-TWT Document 1 Filed 07/31/24 Page 53 of 63

169.

Defendant Muhammad breached these ministerial duties by failing to perform the required visual well-being checks or the security rounds.

170.

Defendant Muhammad's absence from his post occurred with full knowledge that the risk of being harmed or killed facing the inmates in 7North

was higher than in other areas of the Jail.

171.

To leave the Jail's most violent inmates unsupervised for an hour is beyond gross negligence.

172.

Unknown Officer's abandonment of his post was intentional decision, while knowingly allowing violent inmates with ready access to materials to fashion weapons, to roam the Jail outside their cells unsupervised.

173.

Landry would have lived had the mandated ministerial duties been performed during the hour that Unknown Officer abandoned his post.

## COUNT IV

42 U.S.C. § 1983: Supervisory liability of

Sheriff Labat arising from Unknown Officer's failure

to perform visual well-being checks and security rounds

during the hour of Travis Landry's death

174.

Defendant Sheriff Labat's supervisory failure, including his failure to adequately supervise Unknown Officer and others, created a causal connection to the fatal attack on Travis Landry .

175.

Defendant Labat was well aware of the severe understaffing at the Fulton County Jail.

176.

Defendant Labat was well aware that as a result of the severe understaffing a regular part of Unknown Officer's job, posting the head count inside the watch commander's office, would require him to leave his assigned area of 7-North, effectively leaving 7-North, one of the most violent areas in the Fulton County Jail, unattended for a significant period of time. Upon information and belief, this is a pattern of absence from 7-North of which the detainees on 7-North would have become aware over time.

177.

Defendant Sheriff Labat was well aware of the history of widespread inmate-on-inmate abuse and violence at the Fulton County Jail, including in 7-North, where Travis Landry was housed.

178.

The deplorably unsanitary condition of the Jail, the serious overcrowding of the Jail, the serious understaffing of the Jail, and the ready availability of materials from which to fashion knives/shanks could be fashioned were known contributors to inmate-on-inmate abuse and violence, but were left largely unaddressed by Defendant Labat.

179.

Defendant Labat's deficiencies in supervision encompass the inadequate handling of substantial overcrowding, critical understaffing, and the proliferation of weapons made from the crumbling infrastructure of the Jail.

180.

Defendant Labat's failure to act constitutes deliberate indifference to Landry 's safety and well-being, resulting in serious harm – Travis Landry's death.

181.

By not providing for the continuous presence of detention officers on 7-

North when detainees were outside their cells, Defendant Labat personally participated in the violation of Landry's constitutional rights.

182.

Defendant Labat was well aware of the critical staffing shortages at the Jail, including on September 22, 2022.

183.

On July 21, 2023, the National Institute of Corrections (NIC) [of the U.S. Department of Justice] and the Bureau of Justice Assistance (BJA) made a site visit to the Fulton County Jail.

184.

Defendant Labat informed the NIC and BJA that the number of uniformed staff vacancies in the Jail was at a critical staffing shortage level.

185.

Defendant Labat informed the NIC and BJA that a housing floor at the Fulton County Jail should ideally have two officers in the housing control room, as well as three officers who constantly move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

186.

Defendant Labat admitted to the NIC and BJA that, in practice, there is typically only one officer in the Jail's housing control room and, at most, one officer, moving through the housing zones with nearly two hundred detainees.

187.

Defendant Labat further admitted to the NIC and BJA delegation that observation of detainees at the Fulton County Jail was intermittent and that generally interaction with Jail staff was limited to a roving officer who moves in and out of the housing units.

188.

Defendant Labat was aware that with only one officer moving through the housing zones, if that officer left, for example, to turn in a head count to the watch commander's office, there would be no officer remaining to attend to the nearly 200 out of cell detainees in the housing zones, including on 7-North.

189.

By Defendant Labat not providing for the continuous presence of detention

officers on 7-North when detainees were outside their cells, there is a causal connection between Defendant Labat's actions as the supervising official at the Fulton County Jail and the violation of Travis Landry's constitutional right to be protected as a detainee.

190.

The causal connection for Defendant Labat's supervisory liability exists based on a history of critical understaffing, along with a history of widespread violence, including knife violence at the Jail, that would have put Defendant Labat on notice of the need to correct the constitutional violation (failure to protect a detainee's health and well-being). Notwithstanding, Defendant Labat failed to make sure there was the continuous presence of a detention officer on 7-North when the detainees were outside their cells.

191.

Defendant Labat's supervisory liability is a direct and proximate cause of Travis Landry's injuries, pain and suffering, and death.

**COUNT V**

Supervisory Liability under 42 U.S.C. § 1983

Against Sheriff Labat for failing to relocate Landry to a Different Floor after Being Attacked in April 2022

192.

Defendant Sheriff Patrick Labat, as the supervisor of the Fulton County Jail, is liable for the constitutional violations suffered by Travis Landry.

193.

Just months before he was killed, Travis Landry was attacked by another inmate who was awaiting a murder trial, demonstrating the need for heightened security and for Landry to be placed in a safer environment. 194.Upon information and belief, Defendant Labat was aware of this prior attack on Travis Landry well before September 22, 2022.

195.

Despite the known risks and previous violent incident, Defendant Labat failed to take appropriate measures, such as moving Landry to a different floor, or implementing enhanced security protocols with respect to Travis Landry .

196.

29

Defendant Labat's failure to act constitutes deliberate indifference to Landry's safety and well-being, resulting in serious harm – Travis Landry's death.

197.

By not relocating Travis Landry following the violent attack on him, Defendant Labat personally participated in the violation of Landry's constitutional rights.

198.

By not relocating Travis Landry following the violent attack on him, there is a causal connection between Defendant Labat's actions as the supervising official at the Fulton County Jail, there is a causal connection between Defendant Labat's actions as the supervising official and the violation of Dino Landry's constitutional right to be protected as a detainee.

199.

The causal connection for Defendant Labat's supervisory liability exists based on a history of widespread violence, including knife violence at the Jail, that would have put Defendant Labat on notice of the need to correct the constitutional violation (failure to protect a detainee's health and well-being). Notwithstanding, Defendant Labat failed to relocate Travis Landry or provide specific protection to him in light of the physical attack upon him by otherdetainees.

200.

Defendant Labat's supervisory liability is a direct and proximate cause of Travis Landry 's injuries, pain and suffering, and death.

**DAMAGES**

**WRONGFUL DEATH DAMAGES**

201.

Plaintiff, as the legal representative of Mr. Landry's estate is entitled to recover damages under Georgia's Wrongful Death Act, O.C.G.A. §51-4-2, and as otherwise provided by law.

PUNITIVE DAMAGES

202.

The conduct of Defendant Labat and Unknown Officer , as described above, rose to the level of reckless, willful, and wanton failure to

act, which demonstrated a conscious deliberate indifference to the consequences of their actions and entitles Plaintiff to an award of punitive damages as allowed by law.

WHEREFORE Plaintiff demands as follows:

a) That this action be tried by a jury;

b) That general and compensatory damages be entered in favor of Plaintiff and against Defendants in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c) That Plaintiff be awarded punitive damages against each Defendant who has been sued in his individual capacity.

d) That Plaintiff be awarded reasonable attorney's fees, expenses, and costs of litigation;

e) That all costs of this action be taxed against Defendants; and

f) That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances